Filed 2/24/14  P. v. Foster CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JACK FOSTER,<br><br>        Defendant and Appellant. | A136138<br><br>(Contra Costa County<br>Super. Ct. No. 51120781) |

A jury convicted defendant of possessing marijuana for sale (Health & Saf. Code, § 11359)[1], cultivating marijuana (§ 11358), and misdemeanor theft of utility services (Pen. Code, § 498, subd. (b), (d)). The court suspended imposition of sentence and placed defendant on probation conditioned upon serving one year in county jail. Defendant raises multiple claims on appeal, chief among them that the trial court erred in excluding a medical marijuana defense. (§ 11362.5.) As discussed below, the defense was properly excluded because defendant failed to present sufficient evidence that he possessed and cultivated marijuana for personal medical purposes and that he did so with the approval of a physician. We shall affirm the judgment.

---

[1] All further statutory references are to the Health and Safety Code, except as indicated.

1

**Statement of Facts**

## I. *Police surveillance and search*

In 2009, law enforcement officers arrested Kevin Ackerman for transporting methamphetamine and monitored telephone calls he placed from jail to his girlfriend, Jennifer Curtis. In the conversations, Ackerman told Curtis that marijuana was being cultivated at a house he owned and directed her to go there to collect money from "Jack."

In December 2009, police detective Josh Vincelet went to Ackerman's Antioch house to conduct surveillance. The detective observed condensation on the windows of Ackerman's house but no condensation on the windows of neighboring houses. The detective went through trash placed at the curb in front of the house and found marijuana remnants, empty bottles of fertilizer, and packaging for a large quantity of hydroponic grow blocks commonly used in marijuana cultivation. The trash also contained mail with defendant's name on it.

Detective Vincelet obtained a search warrant on January 5, 2010 and he and other police officers searched the house that same day. Defendant and two other people were located inside the house and detained. An attached garage contained 201 marijuana plants. The garage was used exclusively for marijuana cultivation: the door to the driveway was walled shut with steel girders and sheetrock and the interior space was fashioned with walled rooms equipped with high-intensity grow lamps, water pumps, thermometers, fans, and ventilation ducts. The electric utility meter had been bypassed to direct electricity to the garage without paying for it. The marijuana cultivation in the garage consumed an average of about $800 per month in electricity. The marijuana plants in the garage were of three types. There were 118 small, four-inch plants, 75 plants about one-foot tall ready to harvest, and eight "mother plants" used to clone new plants.

The house had three upstairs bedrooms. The master bedroom contained items with defendant's name on them, clothing in his size and "hunting shotguns." A hallway closet

on the first floor across from the garage entrance contained a loaded .45-caliber pistol. The pistol was on a shelf with mail addressed to defendant.

## II. *Defendant's police statement*

Defendant was arrested and, after waiving his right to remain silent, was interviewed at the police station by Detective Vincelet and another officer. The interview was approximately 30 minutes. The jury viewed a videotape of the interview and was provided a transcript.[2]

Defendant told the police he went to high school with Ackerman. Ackerman was growing marijuana at the Antioch house before he was arrested but had problems growing the plants and was "losing money." Around September 2009, Ackerman asked defendant for help. Defendant had experience "growing weed," having grown as many as 200 plants at a time. Defendant saw that Ackerman had the room temperature too high and "just didn't know what he was doing." Defendant told Ackerman he should pay for electricity rather than diverting it because he risked getting caught, but Ackerman was "greedy." Defendant said the marijuana plants being harvested before he came to the house "weren't even worth selling."

Defendant moved into the house and began cloning and caring for the marijuana plants. Defendant cloned about 150 plants from one of the mother plants "per cycle," of which about 80 survived. The 80 plants yield about three and one-half pounds of marijuana. Defendant said they harvested plants every six-to-eight weeks. Defendant smoked some of the marijuana for "pain relief" and would "pay rent with it." He took harvested marijuana to an Oakland cannabis club. The club took the marijuana "on consignment" and defendant returned in a few days to "pick up the money." Defendant said the profit from club consignment is "[n]ot very good." Defendant explained that the

---

[2] The transcript was edited to omit references to defendant's criminal history and other collateral matters.

street value for a pound of marijuana is about $3,500, but he received only about $2,500 per pound from the club. Ackerman's girlfriend, Curtis, collected money from defendant. Defendant told the police "I gave her . . . like, maybe $5,000. And then I gave her like, $2,000." The detective asked defendant if Curtis "was trying to fuck you out of money or anything like that." Defendant replied: "She ain't trying to fuck me out of no money. I'm smarter than that."

Defendant said the three shotguns found in the master bedroom belonged to him, were registered, and were used for hunting. Defendant said he did not own the pistol found in the downstairs closet and did not know there was a pistol in the house.

### III. *Trial testimony*

At trial, Detective Vincelet opined that defendant cultivated and possessed marijuana for sale, not for personal use. In support of his opinion, the detective noted that defendant had a rotational cultivation that produced three and one-half pounds of marijuana every six-to-eight weeks. Detective Vincelet testified that a heavy, daily user of marijuana consumes no more than three pounds a year.

Defendant testified at trial that he and his brother were growing marijuana at the Antioch house for their personal use.[3] Defendant acknowledged that he told the police "a much different story" following his arrest but claimed he was "high" on marijuana and prescription drugs when interviewed. Defendant said he smoked marijuana and took prescription pain medication around 9:30 a.m., before the police search. Defendant said he uses narcotics to relieve pain from work-related nerve damage.

On cross-examination, defendant admitted he had a large number of marijuana plants at the house, although he put the number at 173 instead of 201. He said he used Ackerman's home and equipment to grow and harvest plants for personal use of himself

---

[3] The police search of the house discovered a medical marijuana recommendation for defendant's brother but no indication of the brother's residency.

and his brother. Defendant denied selling marijuana to a dispensary. Defendant was questioned about his claimed intoxication at the time of the police interview and admitted that the marijuana and medication he claimed to have ingested at 9:30 a.m. would have no effect after six hours.

On rebuttal, Detective Vincelet testified that defendant showed no signs of intoxication when interviewed. Defendant was interviewed at 6:00 p.m., over eight hours after defendant's claimed drug use.

## IV. *Verdict, sentencing and appeal*

The jury found defendant guilty of possessing marijuana for sale (§ 11359), cultivating marijuana (§ 11358), and misdemeanor theft of utility services (Pen. Code, § 498, subds. (b), (d).). Allegations that the marijuana offences were committed while armed with a handgun were found not true. The court suspended imposition of sentence and placed defendant on probation conditioned upon serving one year in county jail and paying specified fees and fines, including $2,500 for controlled substance cleanup costs. Defendant filed a timely notice of appeal.

## Discussion

## I. *The medical marijuana defense was properly excluded*

Under the Compassionate Use Act of 1996 (CUA), enacted as Proposition 215, California laws prohibiting possession and cultivation of marijuana do not apply to a patient who "possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician." (§ 11362.5, subd. (d).) The CUA provides an "affirmative defense" that a defendant may invoke "by introducing at trial evidence that raises a reasonable doubt as to the facts underlying the CUA defense." (*People v. Dowl* (2013) 57 Cal.4th 1079, 1086.)

The prosecution anticipated that defendant would offer evidence of a medical marijuana defense and filed an in limine motion to exclude the evidence. The prosecution maintained that defendant's physician-approved marijuana use had expired and, even if

he had existing approval, defendant sold marijuana to a dispensary rather than using it exclusively for personal medical purposes. The prosecution submitted a copy of a medical marijuana card issued to defendant by Dr. Roger Ellis. The card was issued on December 3, 2008 and states that the "time period covered" is "one (1) year." Defendant was arrested on January 5, 2010 for possessing and cultivating marijuana, approximately one year and one month after the card was issued. The court read the card to mean that defendant's physician-approved marijuana use had expired but offered to hear testimony from Dr. Ellis in an evidentiary hearing conducted under Evidence Code section 402.

At the hearing, Dr. Ellis testified that he always conducts a "good faith examination" of a new patient before recommending marijuana for medical use and when reevaluating an existing patient for continued marijuana use. Dr. Ellis said he first approved defendant for marijuana use to ease back pain in 2001. He issued "a one-year recommendation" at that time. The doctor testified that the last time he issued a recommendation for defendant was on December 3, 2008. The recommendation was for "a one-year period from the date of issuance." Dr. Ellis testified that he helped establish California Medical Board guidelines that place a one-year time limit on medical marijuana recommendations and strictly follows those guidelines in his practice.

The following testimony was elicited by the prosecutor: "Q. . . . When you issued a one-year recommendation for [defendant] on December 3rd of 2008, what does that mean? [¶] A. In our assessment he should be qualified under Proposition 215 to . . . obtain and cultivate [marijuana] for personal and medical use. [¶] Q. For how long? [¶] A. For a one-year period from the date of issuance. [¶] Q. So that would mean that he would be authorized under this medical . . . marijuana recommendation that you gave him to possess and cultivate marijuana until December 3rd, 2009? [¶] A. Yes. For personal medical use, yes." Dr. Ellis also testified, over objection, that his recommendation authorized defendant "to be legal, so to speak, for one year from the date of issuance."

6

The court found that Dr. Ellis issued a one-year approval and recommendation for defendant's medical marijuana use in December 2008, which had expired. The court also noted that defendant told the police he sold marijuana to a cannabis club and thus his possession and cultivation of marijuana was not exclusively for personal medical use. The court barred defendant from presenting evidence of a medical marijuana defense under the CUA, ruling that defendant failed to proffer evidence sufficient to raise a reasonable doubt that he possessed and cultivated marijuana for personal medical purposes with a physician's approval or recommendation.

The court's ruling was correct. Defendant argues that the jury should have been permitted to decide defendant's medical marijuana defense, but the court acts as a "gatekeeper" and properly conducts an Evidence Code section 402 hearing when physician approval is contested. (*People v. Jones* (2003) 112 Cal.App.4th 341, 350, 356.) "If the defendant produces evidence at the section 402 hearing sufficient to raise a reasonable doubt as to whether he had a physician's approval to use marijuana, then the gatekeeping function of a section 402 hearing is satisfied and the defense should go to the jury to decide. Only if the defendant fails to produce sufficient evidence to raise a reasonable doubt about the existence of an approval is the trial court justified in keeping the matter from the jury." (*Id.* at p. 350.)

The evidence here was clear. Defendant did not have existing approval for medical marijuana use. Defendant's physician testified that he issued a recommendation on December 3, 2008 that authorized defendant to possess and cultivate marijuana for personal medical use for only one year. The physician's testimony was unambiguous in explaining that defendant was not approved for indefinite marijuana use. Dr. Ellis testified that he strictly follows California Medical Board guidelines in requiring yearly renewals of medical marijuana recommendations and never "just sign[s] off to another six months or year recommendation." Dr. Ellis testified that he always reevaluates a patient's need for marijuana before renewing a recommendation and that reevaluation

7

entails physical examination of the patient, case history review, and assessment of the patient's progress. This case is unlike *People v. Windus* (2008) 165 Cal.App.4th 634, 640-641, where a defendant was permitted to present a medical marijuana defense because his physician, while suggesting yearly reevaluations, did not set an expiration date on his marijuana recommendation. Dr. Ellis clearly did set an expiration date on his marijuana recommendation.

Defendant not only failed to present sufficient evidence of physician approval but also failed to present evidence that his possession and cultivation of marijuana was restricted to personal medical use. Defendant did not testify at the section 402 hearing and his police statement, which was admitted, indicated that defendant smoked some of the marijuana for pain relief but also that defendant sold pounds of marijuana to a cannabis club for thousands of dollars. Defendant argues that his police statement about profiting from the marijuana cultivation is ambiguous. There is no ambiguity. Defendant said he took marijuana to the cannabis club, left it there on consignment, and returned three days later to "pick up the money." He complained to the police that the profit on club consignment was "[n]ot very good," noting that the club gave him $2,500 for a pound of marijuana that would sell for $3,500 on the street. The trial court properly found that defendant failed to produce sufficient evidence to go forward with a medical marijuana defense.

## II. *The jury was properly instructed that defendant had no medical marijuana defense*

At the prosecution's request, the court instructed the jury as follows: "No evidence has been presented that the defendant possessed a valid medical marijuana approval or recommendation on January 5, 2010. California's medical marijuana laws are therefore no defense to any of the crimes charged against him. [¶] The fact that the evidence may show [defendant's brother] Jerry Foster had a valid medical marijuana recommendation on January 5, 2010 does not provide a medical marijuana defense to the defendant."

The instruction was proper. The court administered the instruction because defendant injected into his trial testimony claims of a medical need for marijuana in defiance of the court's ruling excluding testimony on the subject. Defendant was limited to presenting a personal use defense but repeatedly referenced his medical need for marijuana when testifying. On direct examination, defendant was asked, "Why were you growing marijuana" and he replied, "For my medical purposes." The prosecutor objected and, following a discussion between the court and counsel in chambers, the answer was stricken. Defendant modified his answer to say he was growing marijuana for personal use but continued during the course of his testimony to suggest a medical marijuana defense.

On several occasions during cross-examination, defendant volunteered information about his medical marijuana use that went beyond the call of the question. When the prosecutor challenged defendant about his claimed intoxication during the police interview, defendant listed the drugs he was prescribed and added "marijuana gives me different relief from the nerve damage that I have due to a work injury." When the prosecutor asked defendant what kind of plants he was growing in the garage, defendant said he had several types "to try to see if that was gonna be the kind of weed that would help our ailments from – from our injuries." The prosecutor asked the time period needed to grow marijuana and defendant replied, "Some are three months. Takes three months to cycle 'em out, so I – it depends. We were just getting ready to move in a different kind of plant because the one that we were using wasn't giving us the relief from the nerve damage that we were looking for. Certain weeds do certain things, so we were trying a new kind of strain to see if that was gonna work for our ailments." The prosecutor asked defendant if he ever grew marijuana for Ackerman and defendant gave an unresponsive answer about the hard work of growing marijuana that ended with the remark, "So there's more work into it than just flicking a light on and sitting back and

9

watching it. It doesn't work that well. I wish we – I wish it did 'cause then, you know, my back wouldn't hurt like it does."

Defendant introduced extraneous evidence of medical marijuana use despite a pretrial ruling excluding that evidence. The court concluded that a clarifying instruction was necessary "in the face of [defendant's] telling [the jury] about his medical marijuana use." Under the circumstances presented, the court did not err in giving the requested instruction.

### III. *Defendant has failed to demonstrate judicial bias*

Defendant contends the trial court "allied itself with the prosecution" and made unfounded, biased rulings that deprived him of a fair trial. Failure to raise the issue of judicial misconduct at trial forfeits the issue on appeal. (*People v. Farley* (2009) 46 Cal.4th 1053, 1110.) It is also without merit. "[A] trial court's numerous rulings against a party - even when erroneous - do not establish a charge of judicial bias, especially when they are subject to review." (*Ibid.*) The trial court's rulings here were not erroneous and provide no suggestion of bias.

Defendant faults the trial court for excluding his medical marijuana defense, claiming he was held to a higher standard than the prosecution. He argues that he was required to follow proper procedure in renewing his physician's approval of his marijuana use while the court forgave clerical errors in a police detective's search warrant affidavit when reviewing the legality of the search. The affidavit was prepared shortly after the start of 2010 and contained several handwritten additions that were mistakenly dated 2009, then corrected to 2010. Defendant asserts that the detective, who "could not get the dates straight in his search warrant affidavit," was excused from proper procedure but defendant's failure to renew his medical marijuana authorization did not receive the same judicial latitude. The two matters are not comparable and provide no evidence of favoritism. As discussed earlier, the CUA is an affirmative defense that requires evidence a defendant has physician approval to possess marijuana. The court

was without discretion to excuse defendant's noncompliance with statutory requirements. The court was within its discretion, and exercised it reasonably, in admitting a search warrant affidavit with minor clerical corrections.

The remaining asserted instances of claimed judicial bias are equally meritless. Defendant claims "defense counsel was constrained when it came to developing evidence of bias and motive on the part of Detective Vincelet," and points to the prosecutor's efforts to exclude evidence of a civil rights lawsuit defendant filed against the detective and other officers arising from the search of defendant's residence that led to his arrest. Defense counsel was not constrained in presenting this evidence. The prosecutor requested exclusion but the court denied the request and permitted defense counsel to ask Detective Vincelet about the lawsuit. Defendant notes that defense counsel asked the detective only a single question concerning the detective's awareness of the lawsuit, and argues that one question on the subject was insufficient. But defense counsel told the court from the beginning that his "intention was to ask Detective Vincelet only one question" related to the detective's awareness of the litigation. The court allowed defense counsel to do precisely that; it did not constrain counsel's presentation of evidence.

## IV. *Defendant has failed to demonstrate ineffective assistance of counsel*

" '[T]he right to counsel is the right to the effective assistance of counsel.' " (*Strickland v. Washington* (1984) 466 U.S. 668, 686.) "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Ibid.*) To establish ineffective assistance, defendant must show both that his counsel's performance was deficient and that he suffered prejudice. (*Id.* at p. 687; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.)

Defense counsel's performance was not deficient. Defendant complains that the pretrial evidentiary hearing on the medical marijuana defense was concluded without counsel asking Dr. Ellis specifically "whether his 'approval had expired or not.' " The

11

topic, however, was exhaustively explored at the hearing. Nothing would have been gained by asking the proposed question given the doctor's unequivocal testimony that his recommendation was for "a one-year period from the date of issuance" on December 3, 2008 and that he never renews a recommendation without a detailed reevaluation of the patient. Clearly, the doctor's approval had expired.

Nor was counsel ineffective in failing to "present any evidence to rebut the detective's testimony about yield (including survival rates of marijuana plants) or dosage, or effectively cross-examine in that regard." Defendant's police statement, in which he admitted to high yields and plant survival, made it difficult to suggest otherwise. Nevertheless, counsel cross-examined Detective Vincelet on these topics and succeeded in eliciting the detective's opinion that defendant "was embellishing not only on the yields, but of the survivability of his clones."

Defendant asserts that his trial counsel should have objected to Detective Vincelet's testimony that firearms are commonly found at the site of marijuana cultivation because drug dealers want to thwart robberies and police action. Counsel did object in pretrial proceedings. Counsel made an in limine motion to exclude all evidence linking marijuana cultivation with criminality. The court granted the motion in large part, restricting the prosecution to evidence linking marijuana cultivation and guns. The court permitted the subject testimony because it was directly relevant to allegations that defendant possessed and cultivated marijuana while armed with a handgun. The court's ruling was correct. Defense counsel acted properly by not objecting to evidence that was clearly admissible and had been ruled so by the court in pretrial proceedings.

Defendant's remaining claims of ineffective assistance of counsel are likewise unavailing. The record fails to support defendant's claim that counsel's presentation of evidence and cross-examination of witnesses was deficient. Moreover, any deficiency was not prejudicial. The evidence of defendant's guilt was overwhelming. Defendant's own admissions to the police established he was cultivating marijuana far in excess of his

personal use and possessed it for sale. At trial, defendant retracted his police statement and claimed he cultivated and possessed marijuana for his personal use. But defendant admitted to cultivation of almost 200 marijuana plants on a rotating basis. That testimony, coupled with Detective Vincelet's testimony about a single user's rate of consumption, provided strong evidence that defendant cultivated and possessed marijuana for sale.

## V. *Defendant forfeited his challenge to the controlled substance cleanup cost assessment by failing to object in the trial court.*

A law enforcement agency may obtain recovery from a cultivator or manufacturer of a controlled substance for expenses incurred in seizing and eradicating the substance by filing a civil action (§ 11470.1) or by assessment upon conviction in a criminal case (§ 11470.2). The court levied a $2,500 assessment here, payable to the Antioch Police Department.

Defendant contends the assessment must be stricken because the court cited the former statute governing civil actions rather than the latter statute governing criminal assessments, which demonstrates a mistaken assertion of authority. We reject the contention. The court did not assert authority under section 11470.1 but under section 11470.2. The court appears to have referred to section 11470.1 because that section and section 11470.2 are interrelated. An assessment under section 11470.2 allows recovery "of all expenses recoverable under Section 11470.1 . . . ." (§ 11470.2, subd. (a).) As we understand the court's order, it directed defendant to pay cleanup costs, which are costs recoverable under section 11470.1, as an assessment under section 11470.2.

The court's order was not mistaken in its assertion of authority but was mistaken in failing to comply with procedural requirements under section 11470.2, among them that the prosecutor file a petition to which the defendant may respond and demand a jury trial. (§ 11470.2, subds. (b), (c), (d).) However, defendant failed to object when the prosecutor requested costs and, later, when the court imposed costs. The failure to object

13

in the trial court to the imposition of cleanup costs under section 11470.2 forfeits the issue on appeal. (*People v. Brach* (2002) 95 Cal.App.4th 571, 576-580.)

## Disposition

The judgment is affirmed.

_____
Pollak, Acting P.J.

We concur:

_____
Siggins, J.

_____
Jenkins, J.